HUTCHINS *v.* MURPHY.

1. LOST INSTRUMENTS—DEEDS—ESTABLISHING — EVIDENCE—SUFFI-
CIENCY.
   On a bill to establish a lost deed, evidence examined, and *held*,
   insufficient to show that such a deed was ever executed.

2. EVIDENCE—IMPEACHING EVIDENCE—PROBATIVE EFFECT.
   Where a witness has testified that she did not execute a deed
   claimed to have been executed by her, testimony that she has
   stated elsewhere that she did execute such a deed amounts at
   the most to impeaching evidence, and is not proof that she
   did execute the deed.

Appeal from Kalkaska; Chittenden, J.   Submitted November 13, 1906.   (Docket No. 125.)   Decided December 17, 1906.

Bill by Daniel C. Hutchins, guardian of Gladys Murphy, an infant, against James Murphy and Jennie Murphy to establish a lost deed.   From a decree for complainant, defendants appeal.   Reversed, and bill dismissed.

*Ernest C. Smith*, for complainant.

*J. L. Boyd* and *John W. Patchin*, for defendants.

HOOKER, J.   Some time between 1890 and 1895 John Murphy purchased the 40 acres of land in question for $225.   He and his wife joined in a deed of the same to his brother, James Murphy, on March 18, 1895.   He procured a divorce from his wife within a year thereafter, and in 1902 he died.   The complainant Hutchins is guardian for John Murphy's daughter, an infant, and this bill is filed in her interest, as sole heir of her father, to compel James Murphy to deed the premises to her.   The bill alleges that the deed from John to James Murphy was given without consideration, under a collusive ar-

rangement between them, in anticipation of the divorce proceedings to prevent John's wife from obtaining alimony, and that about two years later, James Murphy and wife deeded the premises back to John Murphy, and that the deed was never recorded, but was lost. After a hearing upon proofs taken in open court, the circuit judge rendered a decree in accordance with the prayer of the bill, and the defendants have appealed.

An examination of the record will show that the only testimony supporting the claim that the transaction with James was a collusive arrangement in anticipation of a divorce between John and his wife is that of the divorced wife, the mother of complainant's ward. She stated that she married John December 25th, and the bill for divorce was filed against her the following March; that some time in March, before the bill was filed, John wanted to sell the place to his brother James, and move to East Jordan to live; that she consented and the deed was executed by both; and that a few days afterward his brother (which of the three brothers not being stated) came to John with a disgraceful story and persuaded him to leave her, and he left her within a week, and started divorce proceedings which she did not contest. To sustain the allegation that James deeded the premises back to John afterwards, two witnesses were sworn, who said that they were called to John Murphy's house to witness a paper, that James was not there, but his wife, Jennie Murphy, was, and at John's suggestion that "this is a good time to sign these papers," Jennie produced a writing and directed them where to sign. One said he supposed it to be a deed of that place, because the words "Warranty Deed" were at the top, but both admitted that no one said that it was such, and that they did not know whether it was or not. On the other hand, Jennie testified that it was not; that an arrangement had been made by which John was to have the place for 10 years, and the paper in question was a lease or contract that she drew, and which her husband did not sign, but she did by his permission. James Mur-

phy corroborated her in this, and testified that he paid John $250 for the place, and about two years afterwards agreed to deed it back to him whenever he should repay him the money, and what he had put into the place by way of buildings and other improvements; that John proceeded under this arrangement to build a house and barn and put down a well, borrowing for the purpose $200 from their sister Mrs. McKnight, which James learned afterwards was secured by a mortgage given by John upon the place and which has not been paid, but which James expects to pay. James contributed to the buildings. The testimony of James and Jennie Murphy, if believed, would be conclusive of the case if there is no testimony directly contradictory to their statements, but counsel sought to impeach Jennie by showing contradictory statements made by her, and other witnesses were called to show that Dan Murphy and Charles Murphy, both brothers of James Murphy, had testified falsely. All of these witnesses, Jennie and Dan and Charles, were called on behalf of the complainant. Each testified that he did not know of a deed being made by James to John. After laying a foundation, complainant was permitted to show that Dan brought the McKnight mortgage to the register's office for record and asked the witness, who was register of deeds, to look up and see in whom the title stood, and, on being informed that it was in James, said:

"It is just as I expected; his brother John hadn't had the deed put on record."

Dan admitted the conversation with the variation that the language used by him was "just as I expected, he didn't have no deed on record." By another witness complainants showed that Charles told him that his brother John had left a farm, a horse, and a cow, when he died. The most that can be said for this testimony is that it discredited the testimony of these witnesses, and, as all that their testimony amounted to was a denial of knowledge of a deed, it was not important testimony. It

could not be considered as substantive evidence tending to prove the existence of a deed. That the learned circuit judge who heard the cause recognized the unimportance of this testimony and the weakness of complainant's testimony generally appears from his opinion in which he states:

"I feel that the testimony is quite slender. I well realize that it is slim, but I also realize how almost impossible it would be, under the circumstances, for this young girl and the mother of this little child to find any more testimony, and, as the court always charges the jury, it is not the number of witnesses that decides, but the weight of the testimony, but it is the character of the witnesses, and I am free to say that, till Mrs. Lightheiser took the stand and gave her testimony, the court would not have come to the decision that he has now. But, when she came on and told her story (which the court feels confident is true) as to what Mrs. Jennie Murphy told her at that time, as she has testified—under this testimony and the other testimony in the case, the court believes it is the proper and right thing to hold, and I do hold, that this property belongs to this little girl, and a decree will be framed accordingly."

Mrs. Lightheiser was the wife of a farmer who lived in the neighborhood. She was called to assist to the home of John after his death. Her testimony bears the evidences of truth, and impresses us as justifying the confidence that it seems to have inspired. She testifies that on that occasion Jennie had a conversation with her as follows:

"*A.* Well, yes, sir, I remember a conversation about the property.

"*Q.* What, if anything, was said to you by Jennie Murphy at that time relative to the title to the John Murphy farm?

"*Mr. Boyd:* To that we object as incompetent, irrelevant, and immaterial. Anything that may have been said, if there was anything said, by Mrs. Jennie Murphy, would in no way bind the defendant James Murphy.

"*A.* Yes, sir; there was.

" *Q.* What was it ?

"*A.* Do you want me to go straight through ?

" *Q.* Just tell what Mrs. Jennie Murphy said relative to who owned the John Murphy farm.

"*A.* The John Murphy property ?

" *Q.* Yes.

"*A.* Well, she asked me who I thought John Murphy's property would go to, and I told her to Gladys Murphy, and she said: 'Well, they will have to prove that there is a Gladys Murphy first.' And I says, 'Well, Jennie, you people will have to prove that there hain't a Gladys Murphy, or the property will surely go to her.' Then Jennie says: 'Well, I don't know if she will get anything or not. When John and Clara had their trouble John deeded his place to Jim, and when we deeded it back to John we didn't deed it before any witnesses, and I don't know whether she will get anything or not.' 'Well,' I says, 'if any one has anything against the place to hold it, why, it is all right, but, if they hain't, it will go to Gladys Murphy.' Then she said 'Well, there is nobody has anything against the place but Mary McKnight. She has a mortgage of $200.' 'Well,' I said, 'of course they can take that out, and the balance will go to Gladys Murphy.' And I says, 'That was only a scheme to keep Clara Murphy from getting what really belonged to her. John just deeded it so as not to let her have any of it.'

" *Q.* Well, that is all was said by Jennie Murphy relative to the farm or property, was it ?

"*A.* Yes; that is all was said."

At that time James Murphy was not present. The witness testified that such conversation was the first that she heard about a deed from James to John. This testimony does not amount to evidence that such a deed was ever made. The most it does is to discredit Jennie's testimony as to the nature of the instrument executed on the occasion referred to by her.

This leaves complainant's case to rest upon the admitted fact that Jennie signed some kind of a paper which one witness said had the words "Warranty Deed" at the top, and which apparently all admit dealt with this land either as a contract, lease, or deed, and the circumstances relating to the occupancy, mortgaging, etc., by John

146 MICH.—40.

which are not inconsistent with either theory. On the other hand, if we lay aside the testimony of Jennie, the unimpeached testimony of James Murphy, also called by complainant, remains. He said that the deed was not without consideration, as alleged in the bill, for he paid $250 for it. Apparently it was not worth much more. He said further that he never signed a deed of the place; that he did afterwards make a contract under which John occupied and improved the place with a view to re-purchase, and that he authorized his wife to write and sign such a contract, and supposes she did because she told him she did; that he did not know of the mortgage to Mrs. McKnight until it had been given a week.

We are constrained to say that there is no evidence in the record warranting a legal inference that a deed of these premises was given by James Murphy to John Murphy as alleged in the bill, or that Jennie Murphy was authorized to sign a deed for her husband.

The decree is reversed, and the bill dismissed, with costs of both courts, without prejudice to a bill for specific performance.

CARPENTER, C. J., and McALVAY, MONTGOMERY, and OSTRANDER, JJ., concurred.