*In re* CONNERY'S ESTATE.

CONNERY *v.* CONNERY.

1. WILLS — EXECUTION — TRIAL — EVIDENCE—STATUTORY REQUIRE-MENTS—TIME.

Where the contestant, in proceedings to probate a will, con-ceded that decedent had signed the instrument in ques-tion, claiming that the statutory requirements had not been observed, and that the execution of the will had been procured by fraud, and the attesting witnesses dif-fered as to the time of signing, it was not error to charge the jury that if it was executed about the date named in the instrument the will was valid, that if it was not exe-cuted in accordance with the statutory formalities, as stated at length in the charge, the will was not entitled to probate; nor did the court commit reversible error in refusing to permit proponent to answer questions on cross-examination relating to the claims as to date of execution made by the parties in probate court, in which, it was contended by appellant, inconsistent testimony to that given on appeal had been given by proponent, who, on cross-examination, had fully covered the claimed dis-crepancy and his reasons for changing his testimony.

2. SAME—CHARGE TO JURY.

On conflicting evidence of the attesting witnesses to a will which one subscribing witness testified had been executed in strict conformity with statutory requirements, and the other stated had not been attested in the presence of testatrix, it was proper to instruct the jury that the wit-nesses must sign in the presence of decedent, but that did not mean in the same room if they were where she could see them, or practically in the same room, that they must be where she could see them sign and that even if the witnesses denied their signatures or had forgotten the facts, if their signatures could be proved, the due exe-cution of the will might be established.

3. SAME—ALTERATIONS—ERASURES.

It is commonly presumed that, if nothing suspicious ap-pears on the face of a deed except that an erasure has been made, the change was made before the writing

was executed; and so, where proponent testified, without contradiction, that he had erased the word "fore" and corrected it to "four," the court did not err in refusing to give requests to charge presented by contestant that if proponent had failed to account for the erasures the jury should consider that failure in determining upon their verdict, that they might examine the will and the erasures and consider them in relation to the part proponent took in its execution, that if the word "two" appeared under the "four" they should consider the fact in weighing proponent's testimony, and the burden was on proponent to explain the erasures, and if not satisfactorily accounted for the instrument was not the will of decedent.

4. SAME—REVOCATION—SUBSEQUENT WILL.
Testimony tending to show execution of a subsequent will, afterwards destroyed by testatrix, did not prove revocation of the previous testament, without proofs that the later instrument contained an express revoking clause.[1]

5. SAME.·
Evidence offered by contestant as to decedent's relations with her sons and other members of the family, such as money supplied to one of them for his education, authority given by letter to purchase property and other matters, having no reference to a will or proposed change in the will, was properly excluded as immaterial.

6. SAME—COMPROMISES.
Nor was it error to exclude from the consideration of the jury evidence of an agreement effecting a settlement between the sons of testatrix, not signed by another beneficiary named under the will offered for probate, since no disposition of his interest in the estate could be effected without his consent and it was necessary to probate the will in order to obtain his bequest.

7. SAME—EVIDENCE—REVOCATION.
Alleged admissions of the testatrix that she had destroyed her will and ought to make another were objectionable under the rule that a duly executed will may not be shown to be inoperative by declarations of testatrix that she did not intend it to be a final disposition of her estate.

---

[1] The question of the revocation of a will by a subsequent will is discussed in a note in 37 L. R. A. 561.

Error to Saginaw; Gage, J. Submitted April 15, 1913. (Docket No. 65.) Decided May 28, 1913.

James A. Connery presented for probate the last will of Christina Sutherland Connery, deceased, which was admitted to probate. Contestant, William S. Connery, appealed to the circuit court. Judgment for proponent. Contestant brings error. Affirmed.

*Eaton, Holland & Smith,* for appellant.

*Frank E. Emerick* and *Emmet L. Beach,* for appellee.

STONE, J. This case is in this court for the second time. When first here it will be found reported in 166 Mich. 601 (132 N. W. 448). The case was reversed and sent back for a new trial. Another trial has been had resulting in a judgment in favor of proponent, admitting the will of Christina Sutherland Connery, deceased, bearing date August 15, 1904, to probate, and the contestant has brought error.

The testatrix died January 18, 1908, leaving surviving her a husband, James A. Connery, who is proponent of the will, two sons, William S. Connery, who is contestant, and J. Alfred Connery, all of Saginaw, Mich., and also a brother, John Sutherland of Virginia, Minn. It is undisputed that another and later will was executed by testatrix in 1905.

Upon the trial in the circuit court the proponent, after testifying to the execution of the will of August 15, 1904, on direct examination, testified on cross-examination as follows:

"The will that has been shown to me was not the last will that my wife executed. Probably about a year, maybe two years afterwards, she executed one other; that was witnessed by Mr. West and Mr. Dennert, downstairs in the dining room. There were no other wills after this one, except that."

Proponent testified that, while he was driving his wife to the hospital for the operation which resulted in her death, she said she had destroyed "that will," or "a will," and he testified as follows:

"*Q.* At the time she told you she had destroyed the will, didn't she say to you that she ought to make another will?

"*A.* I don't know that she did, but we had talked it over several times.

"*Q.* You won't say she didn't say that, will you, Mr. Connery? Didn't you testify to that in the probate court?

"*A.* We might have talked it over; I am not positive.

"*Q.* Well, isn't it a fact that she said on the way over that she destroyed the will and that she ought to make another?

"*A.* We talked it over several times; we might have, coming up.

"*Q.* You might have on the way over?

"*A.* We might."

Testatrix and proponent had a tin box in which they kept their papers. Either one of them had a key when they wanted to use it. Proponent testified that at the time of the execution of the will dated August 15, 1904, either he or his wife put it in the tin box; that the box was put in a piece of furniture originally made for a library, and later used for a clothes press; that proponent still had the tin box; and that both wills were together in the box. He testified as follows:

"*Q.* You stated to your two sons that you had two wills, one of which practically cut off William S. and the other divided the property equally between them?

"*A.* I don't think I said so. I testified yesterday I told them there were two wills. I didn't say how the distribution, or anything else, was.

"*Q.* You knew what the wills were, didn't you?

"*A.* Well, I don't know that I do remember them all.

"*Q.* But you knew most of what everything was in the will, didn't you? You knew the substance of the will?

"*A.* Practically.

"*Q.* They had been in that tin box; you had looked them over, and read them over, and talked them over?

"*A.* Yes, I had looked them over.

"*Q.* You meant what you said when you told them that you had two wills?

"*A.* Yes, sir."

Proponent told his sons that his wife did not want the will probated for a year after her death. When the year was up, and about January 30, 1909, the two sons went to their father and asked him to have the will probated. He said that he did not have the will in his possession, but that it was in the safety deposit vault. William then asked him if he would get it before the bank closed, and he replied that he would not. Then William said, "Will you tomorrow?" and he said, "Maybe I will;" but he did not, and left the city on February 3d. Proponent testifies that he found the will in October or November, 1908. The two sons then entered into the agreement Exhibit B, which was as follows:

"Whereas, Christina Sutherland Connery, mother of the undersigned, departed this life on January 18, 1908, leaving surviving her James A. Connery, husband, and the undersigned, William S. Connery and Alfred Connery, sons and sole heirs at law, and whereas our mother, the said deceased, died seized and possessed of certain real and personal estate regarding the disposition and descent of which she had expressed her wishes by will and at later date by stating her wishes, and whereas, being desirous of carrying out the intentions and wishes of our mother and for the saving of any and all questions that might lead to or require a legal decision to determine as to the legality of said wishes and former will and its revocation, and as a means of adjusting and settling the rights of the undersigned as sons and heirs of deceased, and in consideration of the foregoing and the amicable and friendly settlement of mutual interests as sons and heirs, it is hereby mutually agreed by and between the undersigned that in lieu of any and all rights as heirs, devisees, and beneficiaries of deceased, as follows:

"(1) We agree that our father, James A. Connery, shall enjoy the use of the property known as the Flats, corner of Johnson and Washington streets, Saginaw, Mich., during the term of his life, to the extent that the will or written wishes of our mother provided he should enjoy the same, but in any event for his life only, he paying legacies and debts.

"(2) We agree to receive, as heirs and devisees in lieu of all provisions by will or wish and in satisfaction of any such rights, an undivided one-half interest to each in and to all estate, real and personal, of our mother; that is, to receive and inherit said property as equal tenants in common.

"(3) We authorize the probate court for Saginaw county to make any and all orders necessary to carry the foregoing into effect and to distribute and administer said estate in accordance therewith.

"In witness whereof, we have hereunto set our hands and seals this 29th day of January, 1909.

"WM. S. CONNERY.          [L. S.]
"J. ALFRED CONNERY, JR.    [L. S.]

"Witnesses:
    "FRED L. EATON.
    "CHARLES WINTERMEYER."

This agreement was excluded by the court on the objection of proponent's counsel that it was incompetent, irrelevant, and immaterial, and in no way attempting to disprove the validity of the will, and because this court, when the case was here before, sustained the former ruling of the trial court excluding it. The court said:

"This agreement was offered and the court ruled it out on the former trial, and the contestant took an exception. The Supreme Court in no way passed upon that, and it certainly would be an important matter in a new trial. If they knew it was coming back for a new trial, they would indicate their views in regard to it."

Whereupon the objection was sustained, and counsel for contestant excepted.

Proponent filed the petition for the probate of the

will in controversy in the probate court of Saginaw county, and contestant filed his objections, claiming, among others, that the signature of the witness Dennert to said will was procured through the fraud and misrepresentation of James A. Connery. A further objection was filed, after the probate court excluded the agreement, Exhibit B, covering that point. Proponent testified that in October or November, 1908, while taking out his wife's clothes from a chiffonier to air them, he found the will in question in the bottom drawer of the chiffonier; that the clothes were resting on a newspaper under them, and the will was under the newspaper; that when his wife died he went and looked in the box in which he had seen the will placed, but could not find it; and that there were no other wills in the box, but there were other papers, such as deeds, releases of mortgages, and receipts for taxes.

The will in question was drafted in 1902 by Alfred Newton of Saginaw, who died in the latter part of that year. Proponent testified that testatrix preserved this draft and on August 15, 1904, executed the same, and that proponent and one Fred W. Dennert affixed their names as witnesses at the time of its execution by testatrix and in her presence.

The witness Fred W. Dennert, whose name appears as a subscribing witness, testified that since the fall of 1905 he had lived in Detroit; that he had lived in Saginaw from 1903 until about October 17, 1905; and that during all the time he lived in Saginaw he had rooms in the Connery Flats. On direct examination he testified as follows:

"Q. Mr. Dennert, I show you Exhibit A [the will in question] and ask you whether you recognize any of the signatures on that paper?

"A. Yes, that is my signature, F. W. Dennert, Jr.

"Q. Will you state to the court and jury the circumstances under which you signed this paper?

"A. I was requested to sign the paper by Mr. Con-

nery, and to come into their living apartments, or into their bedroom. He requested me to come into their room and witness a will. He was there at the time, but I don't recollect whether his wife was there at the time. I walked down after him.

"*Q.* When you went in there, who was there?

"*A.* He was there at the time. I don't remember whether his wife was there or not.

"*Q.* You can't recollect as to that?

"*A.* No, sir.

"*Q.* State the circumstances under which the paper was signed.

"*A.* Upon request; he asked me to sign it, and I signed it. I didn't read it over. I didn't know the nature of it. It was represented to me as a will; they told me it was; and I signed it.

"*Q.* Where was the paper, on the table, or what?

"*A.* I refreshed my recollection some extent when I was there yesterday morning. I am rooming there with him during the time of this trial. He said, 'Fred, here, this is that chiffonier.' Showed me the dresser and the drawers, and then I said, 'Yes, I recollect that.' He came out in the other room; he said, 'There is the table we had.' He showed it to me. I should judge the chiffonier came pretty near up to my shoulder. There was an ordinary standing table. I signed it upon a small table.

"*Q.* Do you remember Mr. Connery signing the paper?

"*A.* That I cannot say.

"*Q.* Or Mrs. Connery?

"*A.* Some eight years, not possible.

"*Q.* Now, you remember Mrs. Connery signing it?

"*A.* I can't.

"*Q.* You can't recollect Mrs. Connery being in the room?

"*A.* I don't remember whether she was there or not.

"*Q.* You wouldn't say definitely?

"*A.* No, sir. I have no interest in the matter and gave it no attention afterwards. I cannot recollect the day of the week or the day of the month; I simply signed my name, to the best of my recollection. I think it was in the evening.

"*Q.* What do you say now?

"*A.* I cannot change my testimony.

"*Mr. Eaton:* I object to counsel leading the witness. (Objection sustained.)

"*Mr. Emerick:* I want to get his very best recollection.

"*The Court:* I sustain the objection.

"*Q.* State what the facts are, whether or not you testified, as to whether it was morning or evening you signed it.

"*A.* I believe it was in the evening. I couldn't state positively."

Cross-examination (by Mr. Eaton) :

"I have been employed a number of years as clerk in the department of parks and boulevards, practically charge of Belle Isle. I don't regard it as a highly responsible position, just a clerk; a man of ordinary capacity could fill it. I was 17 or 18 years with R. G. Dun & Co., and then with the New York Life Insurance Company. I regard my memory as up to the average, and under ordinary circumstances have a pretty fair memory, and on the evening in question I was not under the influence of liquor or anything like that, but was in the full possession of my senses. I don't know positively what time of day or night it was, but think it was the evening. I cannot state whether or not the lights were lighted. I was never in this room before, except once or twice, when I went to the door to pay my rent. I was there this morning. It is a small room.

"*Q.* If at that time Mrs. Connery had been sitting on the bed and asked you to sign that will and had signed in your presence and put her name on that instrument, is there any reason why you would not remember it?

"*A.* I simply don't remember it.

"*Q.* You never signed but one other will besides this in your life as a witness, have you?

"*A.* Subsequent thereto, not before.

"*Q.* You never signed but two wills in your life as witness?

"*A.* That is all. [Continuing:] One was the instrument just described, and the other was a will signed by Mr. West, another roomer at the Connery Flats, at a later date. Those are the only two times

in all my life that I signed a will as a witness, and the only time I was in this room to sit down was on this occasion now referred to.

"Q. And you remember Mr. Connery being in this room at that time?

"A. Yes, sir.

"Q. You remember seeing him sign the will, do you not?

"A. That I don't know.

"Q. Do you remember signing the will yourself?

"A. Yes.

"Q. But you didn't read it?

"A. No, sir; I didn't read the contents of it, not that I know of. I had lived at the Connery Flats for probably two years and a quarter and was well acquainted with Mr. James Connery and Alfred Connery, but did not know Dr. William S. Connery so well. I think he has been living on the west side for several years.

"Q. You say you were over there yesterday?

"A. Yes. Mr. Connery asked me to go and showed me the chiffonier. I am positive I sat in a chair at this table and signed the will.

"Q. You didn't see anybody else sign?

"A. I don't remember that positively.

"Q. You testified in the probate court, and also on the other trial in this court, to the best of your recollection this was in the evening?

"A. Yes. To the best of my recollection it was in the evening.

"Q. As far as your memory went, you don't know whether Mrs. Connery was there or not?

"A. Yes.

"Q. Isn't it a fact the claim was never made in this case that this will was signed in the morning, either by you or Mr. Connery, until the case was tried in the circuit court? (Objected to as incompetent, immaterial, and irrelevant. Objection sustained. Exception.)"

Redirect examination (by Mr. Emerick):

"I lived there from the early summer of 1903 until about the middle of October, 1905. Mrs. Connery, at that time, was mentally competent.

"*Judge Beach:* We insist that the will we have offered in evidence be received in evidence.

"*The Court:* The will may be received.
"*Mr. Eaton:* Note an exception."

In the probate court the proponent had testified that the will was executed in the evening. Upon the trial in the circuit court he testified as follows, on cross-examination:

"*Q.* After your testimony was given in the probate court, we introduced evidence to show that your wife went away in the morning of the 15th of August, did we not?
"*A.* You did.
"*Q.* It was not until this case was tried in the circuit court that you testified positively that you knew it was in the morning?
"*A.* Not until it was tried in the circuit court.
\*   \*   \*
"*Q.* And Mr. Dennert testified as well in the probate court that he believed that it was in the evening, didn't he?
"*A.* I don't know what he testified to.
"*Q.* And it was the claim made by you and Mr. Dennert, on your examination in the probate court, that this will was executed on the night of the 15th of August, 1904? (Objected to as incompetent. Objection sustained. Exception.)"

There was a red line drawn through a portion of the signature of testatrix in the will, which contestant claims was not satisfactorily explained. The only testimony on the subject appears in the cross-examination of proponent, as follows:

"*Q.* I call your attention to the red line that is drawn through a part of your wife's signature Christina and the first part of the word Sutherland.
"*A.* I have seen it before.
"*Q.* Don't you want to look at it?
"*A.* No, sir; I know all about it.
"*Q.* Will you tell us how that line came there?
"*A.* Yes, it was there, and my wife signed over it. I said at the time, 'You should not have signed on that red line.'
"*Q.* I notice an erasure of the word 'four.'
"*A.* Yes.

"*Q.* Did you make that erasure?

"*A.* Yes.

"*Q.* What was there before the word 'four' was written?

"*A.* Four, only it was spelled wrong. I spelled it 'fore.' I spelled it wrong and erased it. I spelled it 'fore' and changed it to 'four.' The date wasn't filled in when it was 'drafted.

"*Q.* As a matter of fact, wasn't the word 'two' written in there? Isn't that what you erased?

"*A.* No, sir. I know it wasn't.

"*Q.* Isn't that why the will was drafted in 1902, didn't you erase the word 'two'?

"*A.* No, sir; I filled in the date.

"*Counsel for Contestant:* I offer this will for the inspection of the jury.

"*Counsel for Proponent:* Counsel doesn't claim that is not Mrs. Connery's signature?

"*Counsel for Contestant:* We have never denied it."

Contestant testified that there was no question in his mind that the signature to the will was his mother's

Proponent testified that testatrix's physical and mental condition was good at that time; and on cross-examination he testified: That it was after the date of this will that Alfred went to Ann Arbor, where he was given a professional education, and since that time had become a practicing dentist.

"*Q.* And it is a fact that he was provided with money in order to complete his education, wasn't it? (Objected to as incompetent and immaterial by proponent's counsel. Objection sustained. Exception.)"

Sixteen of the 24 assignments of error are discussed by appellant under the following heads:

(1) Was the date of the will important? (2) Was the presence of testatrix important? (3) Were the erasures important? (4) The effect of the later will. (5) Whether relations and changed conditions are material; the execution of the will being denied? (6) The effect of the agreement between the two sons. (7)

The materiality of *ante mortem* statement of testatrix that she had destroyed a will, and ought to make another.

1. Was the date important? Under this head counsel for appellant discuss the following assignments of error:

"(1) The court erred in charging the jury as follows:

"'If this will was executed at the date it bears, or at about that time by the testatrix, and signed by these two witnesses, James A. Connery and Mr. Dennert, in her presence, or where she could have seen them sign, then it is her last will and testament.'

"(2) The court erred in charging:

"'The proponent claims that this will was properly executed, and that it is a valid will of Mrs. Connery, and that she made this will at or about the time stated in the will, which is the 15th day of August in the year 1904.'

"(3) The court erred in charging the jury as follows (after stating the manner in which the statute requires a will to be executed):

"'If it was not signed in that way, then it would not be signed in the manner pointed out by the statute, and therefore the will would not be a valid will. I don't know whether there is any dispute here about the date of this will or not, if it was a will at all. Do you gentlemen agree it must have been executed the 15th day of August?

"'Judge Beach: Yes.

"'Mr. Eaton: That is the claim, it was executed the 15th.

"'Judge Beach: Mr. Dennert said he might have signed it the night before.

"'Mr. Eaton: I desire to take an exception to that, that he might have signed it the night before. I ask the court to charge the jury that there is no evidence in this case, or any claim on the part of any witness, that it was signed on any other day excepting the 15th.

"'The Court: I hardly think an instruction of that kind is warranted, because in Mr. Dennert's testimony he says it was signed in the evening; he thought it was signed in the evening; he wasn't sure. Mr. Connery's testimony, as I recollect it, was positive it was signed on the morning of the 15th.'

"(4) The court erred in not permitting the question to be asked of proponent as to the claim made by him and Mr. Dennert in the probate court that the will was executed on the night of August 15th."

"(20) The court erred in refusing to permit the following question to be answered by the contestant:

"'Q. Now, you may state whether or not they made any claim, that it was claimed by counsel it was in the morning, until after you had brought evidence to show that your mother had left for Minnesota on the morning of the 15th of August. (Objected to.)

"'*The Court:* So far as the claim is concerned, I sustain the objection.

"'*Mr. Eaton:* Exception.

"'*The Court:* I sustain the objection on the ground that the claim of the party is incompetent.'

"(20½) The court erred in refusing to permit the witness Dennert to answer the question put to him on cross-examination whether the claim was ever made that the will was signed in the morning, either by the witness or proponent, until the case was tried in the circuit court, as above set forth in the testimony of the witness."

It is conceded by counsel for appellant that where the only question involved is the observance or nonobservance of statutory requirements, and the main fact of the execution of some sort of an instrument is conceded or proven, it may be true as the court charged that the date is unimportant, and that under such circumstances the entire lack of a date ought not to, and does not, invalidate the instrument. But it is urged that another question arises when fraud is claimed, and it is denied that any instrument was executed; and that, if the theory of contestant is true, it could not better be proven than by showing that testatrix was not in the city at the time the subscribing witnesses swear she executed the instrument. It is said that the original claim was that the testatrix executed the will on the evening of August 15, 1904, but it was made to appear that the testatrix left the

city early in the morning of the 15th. It is urged that proponent recognized the unimpeachable character of this evidence and changed his testimony, and admitted that he changed it in the circuit court. He there testified that the will was executed in the morning early, before the testatrix left the city. The witness Dennert testified, as above shown, that he believed he affixed his signature to the instrument in the evening, but was not sure, and could not state positively. From this record it appears that appellant was given all reasonable latitude to show when the will was made.

The evidence shows that Mrs. Connery had been in the city for some time until she left her home for Virginia, Minn., on the morning of the 15th. The proponent testified at great length on cross-examination and on redirect examination, giving in detail the reasons why he changed his testimony. This was all before the jury. There having been great latitude given in the cross-examination of the witnesses as to what they had testified to in the probate and circuit courts relating to the execution of the will, we do not think there was error in refusing to permit answers to the questions covered by assignments of error 20 and 20½ as to the claim made by them or by counsel. It seems to us that this whole subject was before the jury, was discussed, and we have a right to suppose was considered by them. That there was "a change of front," on the part of proponent, as claimed by counsel for appellant, was apparent, and the reasons therefor, whether good or bad, were in evidence, and we are unable to say that the court erred in its rulings or charge here complained of.

2. Was the presence of testatrix important? Under this head it is claimed in the fifth assignment of error that the court erred in charging the jury as follows:

"As I have already said, the witnesses must sign in her presence; and when I say 'in her presence' it does not mean that they be right in the same room, providing they are practically in the same room where she can see them sign if she desires, and is able to do so. That is, they must be where the party making the will can see them sign as witnesses."

Here, also, appellant's counsel concede that the charge here complained of was sound in the abstract, but inapplicable here, because of the claim of fraud; that the issue was narrowed down to the sole question of the truth of proponent's testimony that his wife was in the room and signed the will; that, if she was not in this small room at that time, proponent lied, and the fraud was established; and that no one claimed that testatrix was near at hand, and out of sight, as is sometimes the case. It is urged that the result of applying this abstract proposition to the facts in the case utterly deprived the contestant of any benefit whatever from the testimony of the disinterested witness Dennert to the effect that he had no recollection that the testatrix was present and could not remember that she signed. In this connection attention is called to the charge of the court complained of in the sixth assignment of error:

"The fact of the execution of a will may be shown even against the testimony of a witness or witnesses; it may be shown that they did sign it notwithstanding that they deny the signatures, or have forgotten, if it can be proven that that is the signature of the parties signing it. The due execution of a will may be shown even against the direct testimony of subscribing witnesses."

It is claimed that this part of the charge was erroneous when applied to this case, and reference is made to section 9279, 3 Comp. Laws (4 How. Stat. [2d Ed.] § 10992).

It should be borne in mind that it is conceded that

the name signed to this will was the genuine signature of the testatrix, and the signatures of the witnesses were admittedly genuine. Both witnesses were examined at great length. One witness testified to a state of facts that would show strict compliance with the statute. We have set out in full the testimony of the other witness, Dennert. He testified that Mr. Connery requested him to come into a room and witness a will.

"He was there at the time, but I don't recollect whether his wife was there at the time. I walked down after him.

"Q. When you went in there, who was there?

"A. He was there at the time. I don't remember whether his wife was there or not.

"Q. State the circumstances under which the paper was signed..

"A. Upon request; he asked me to sign it, and I signed it. I didn't read it over; I didn't know the nature of it. It was represented to me as a will; they told me it was; and I signed it."

This is not a case where one witness only was examined. Both testified, and the jury had the benefit of this testimony.

This court held in *Abbott* v. *Abbott*, 41 Mich. 540 (2 N. W. 810), that the probate of a will is not dependent upon the recollection or veracity of a subscribing witness. In the brief of defendant in error in the case cited will be found a collection of authorities to the effect that, if one of the subscribing witnesses testifies that all the statutory formalities were observed, the will may be admitted to probate, even though the other does not remember that they were observed.

We find no error in this part of the charge, nor in that part complained of in the seventh assignment of error.

3. Were the erasures important? Under this head counsel consider the sixteenth, seventeenth, eighteenth,

and nineteenth assignments of error, which complain of the refusal of the court to give contestant's requests to charge, as follows:

*(k)* I charge you that in arriving at your verdict as to whether or not the will presented was the last will of Mrs. Connery, and whether it was executed as required by law, you may consider all the circumstances surrounding its execution, and, if there are erasures in the will, it is the duty of the proponent to account for them; and, if in this case the proponent has failed to account for any erasures, you should consider such failure in arriving at your verdict.

"*(l)* In weighing the testimony regarding any erasures, you may inspect the will and take into consideration the appearance of the erasures in connection with the relations of the proponent to the will, and the part that he took in its execution.

"*(m)* The proponent has testified that the word 'four,' written in the date of the will, was written by him in the blank left for that purpose, and improperly spelled in the first instance, and that he thereupon erased the word 'four' and wrote it in as it now appears, and that the word 'two' had not previously been written therein, or erased. I charge you that you may examine the will and if from an inspection of the same you are satisfied that the word 'two' had originally been written and then erased, and the word 'four' written as it now appears, that you should take this fact into consideration in weighing the testimony of the proponent regarding the execution of said will.

"*(n)* I charge you that, if a will is presented and offered for probate, the proponent has the burden of accounting for any mutilation or erasure appearing in said will, and, if the proponent fails to account for such erasure or mutilation, you should find that the proposed will is not the last will of deceased."

In view of the uncontradicted testimony of the proponent upon the subject of erasures, which we have set out in full, we think the court did not err in refusing to give the requests as here complained of.

This court held in *Munroe* v. *Eastman,* 31 Mich. 283, that the writing of a word over an erasure in a deed may or may not be suspicious. The presumption commonly is, where nothing suspicious appears on the face of the deed beyond the fact that an erasure is manifest, that the alteration was made before the deed was executed. See authorities cited in note to this case. *Sirrine* v. *Briggs,* 31 Mich. 443. It was a fact to be considered by the jury.

4. The effect of the later will. Under this head counsel for contestant say that it is undisputed that a will was made by testatrix in 1905, and that under the authorities, if it contained a revoking clause, all former wills *ipso facto* were revoked. There is no claim that there was any evidence that the later will did, as matter of fact, contain a clause of revocation. But counsel ask us to abandon the doctrine that a revoking clause must be proved to arrive at this result, and to hold that, on due proof of the execution of a will, a presumption arises that it is a revoking will. In other words, we are asked to hold that the execution of a will raises a presumption that it was done *animo revocandi.* We have held that one who claims that a will was revoked by the subsequent execution of another will, which was afterwards destroyed by the testator, has the burden of proving that the latter will contained an express clause of revocation. *Cheever* v. *North,* 106 Mich. 390 (64 N. W. 455, 37 L. R. A. 561, 58 Am. St. Rep. 499) ; *Scott* v. *Fink,* 45 Mich. 241 (7 N. W. 799) ; *Stevens* v. *Hope,* 52 Mich. 65 (17 N. W. 698) ; *Dudley* v. *Gates,* 124 Mich. 440 (83 N. W. 97, 86 N. W. 959). We see no reason for changing the well-settled rule in this State.

5. Whether relations and changed conditions are material; the execution of the will being denied. This matter is presented under the following assignments of error:

"(9½) The court erred in refusing to permit proponent to answer the following question:

"'And it is a fact that he (Alfred) was provided with money in order to complete his education, wasn't it?'

"(10) The court erred in excluding the letter referred to in the following questions and answers in the testimony of contestant:

"'Q. I show you exhibit C, a letter dated August 21, 1904, and ask you whether or not you produced that letter in the probate court, after your father and Mr. Dennert had testified that this was executed in the evening of August 15th?

"'A. Yes, sir.

"'Q. You may state whether or not you received that letter from your mother while she was away.

"'A. I did.

"'Q. I ask you whether or not at this time your relations with your mother were friendly?

"'A. Yes, sir.

"'Q. You may state whether or not she had arranged with you to assist in the purchase of a home on the east side of the river? (Objected to as incompetent, irrelevant, and immaterial. Objection sustained. Exception by contestant.)

"'Mr. Eaton: I offer that letter in evidence. (Same objection, ruling, and exception.)'"

There is no claim by counsel that there was a word in this letter about the will, or a will, or that testatrix was going to change a will. It was a letter about the value of property that she desired her son to purchase. This letter was Exhibit C in the former record in this court, and the same question was presented in appellant's brief. It was not noticed or referred to in the opinion. We think the matter was immaterial, and the court did not err in its rulings.

6. The effect of the agreement between the sons (twenty-second assignment of error) relating to the exclusion of the agreement between contestant and his brother. In the third paragraph of the will it bequeaths to testatrix's brother, John Sutherland, of Virginia, Minn., certain real property in Virginia for the term of his natural life. This agreement was only

between and was signed by the brothers. It was necessary to probate the will in question to enable John Sutherland to get his interest in the property, and he could not be cut off by any agreement between the brothers. Counsel for contestant refer to the case of *Bean* v. *Bean,* 144 Mich. 599, on page 631 (108 N. W. 369). In that case this court said:

"In the case before use there is produced and put in evidence an agreement executed by all the parties in interest. In terms it is an agreement to have done the precise thing which proponent is seeking to do, and which the other parties are seeking to prevent."

That was a proceeding to probate a will.

Here contestant is trying to prevent a will being probated, and offers this agreement in evidence. We are of opinion that the agreement was immaterial and had no bearing upon the issue. The record in the former appeal shows that the same offer was made and ruling had. The fact is stated in our former opinion, but the question was not specifically passed upon. Had we considered the ruling erroneous, we should have so held, as the case was sent back for a new trial.

7. As to the claimed statements of testatrix that she had destroyed a will and ought to make another. Under this head counsel discusses the eighth assignment of error relating to the ruling of the court in sustaining the objection of proponent's counsel to the following question asked proponent on his cross-examination:

"At the time you were driving her over in the cutter, didn't she say something about making another will?"

This was objected to as immaterial and irrelevant, and the objection sustained and exception noted. In its ruling the court said:

"I exclude that on the ground that any talk about the making of some other will would have no bearing upon the question of the validity of this will."

In view of the cross-examination that had been permitted, we do not think the court erred in this ruling. We have held that a will executed by a testator in due form and properly witnessed may not be shown to be inoperative by testimony as to declarations of the deceased that he did not intend it to be a final disposition of his estate.

We have examined all the questions discussed by counsel, and are of opinion that there is no reversible error in the record, and the judgment of the circuit court is affirmed.

STEERE, C. J., and MOORE, McALVAY, BROOKE, KUHN, OSTRANDER, and BIRD, JJ., concurred.