346 Mich. 613 (1956)
78 N.W.2d 266
In re DALTON ESTATE.
REZATTO
v.
DALTON.
Docket No. 35, Calendar No. 46,818.
Supreme Court of Michigan.
Decided September 4, 1956.
*615 Oswald T. McGinn, Leon Garvin, and John J. Walsh, Jr., for proponent.
Michael J. Koury and Charles L. Santini, for contestant.
EDWARDS, J.
John M. Dalton was the proprietor of a dance hall and liquor establishment in Marquette county known as the Brookton, a property of considerable financial value.
This record discloses, without any further detail, that John M. Dalton was murdered on July 9, 1954, and that prior to his death he had executed 2 wills. The first will was dated September 30, 1949. It made Dalton's sister, Elizabeth Rezatto, and a friend, John McClelland, principal beneficiaries. It is conceded by the parties here that this will was properly executed and would be in all ways effective unless it was revoked by a later will.
The second will was dated January 2, 1954. By its terms Ann Dalton, the decedent's mother, and the proponent herein, and John McClelland, were made principal beneficiaries.
Both wills were offered for probate and after hearing in the probate court for the county of Marquette an order, disallowing the second will and admitting to probate the first will, was entered. From this order Ann Dalton, the proponent here, took an appeal to the circuit court. Trial was had before the circuit court without a jury and Judge Glenn W. Jackson entered a judgment reversing the order of the probate court and allowing the will of January 2, 1954. From this judgment the contestant, Elizabeth Rezatto, has appealed.
*616 The second will, which is the subject of this appeal, and which the parties concede was in the handwriting of the deceased, recites as follows:
"BROOKTON BALL ROOM MINNIE CLUB
"Marquette, Mich., January-2-1954
"In this, the last will and testament of myself, John M. Dalton, which supersedes an earlier will drawn in the year of 1949, I do leave, will and bequest to all of my possessions, including the lands (as described on the tax rolls), business and buildings, including the cabin, known as the `Brookton Ballroom' and `Minnie Club' to Anne M. Dalton, my mother, residing in Cheboygan, Mich. for her share a 75% (per cent) interest and to John F. McClelland, a friend, residing at `Paul's Grocery,' Court street, Cheboygan, Mich., a 25% (per cent) interest, subject to the following conditions: After outstanding bills are paid then the sum of $1500.00 (fifteen hundred) to be paid to William H. McKeighan, Snapper Creek Drive, S. Miami, Florida, a person well known to Anne M. Dalton and John F. McClelland and alls also the sum of $5,000.00 (five thousand) to Emil Fassbender, residing at the Brookton now, a person who has served me well and (over) who is well known to Anne M. Dalton and John F. McClelland.
It is my further wish that Anne M. Dalton or John F. McClelland or both be appointed to administer my estate.
 Signed
 L.S. JOHN M. DALTON
 John M. Dalton
 1/2/54
 Witness 1-2-54
 EMIL FASSBENDER
 Emil Fassbender 1/2/54.
 ROY L. BULLOCK
 Roy L. Bullock 1/2/54"
*617 The dispute about the validity of this will hinges upon the execution of the signatures of the 2 witnesses listed above. Emil Fassbender was an employee of the decedent. He testified that he had signed the will at the request of the deceased, who had identified the document to him as his will and requested him to witness it, all in the presence of the deceased and the other witness of the will, Roy L. Bullock. He says further that when he signed the will the deceased had already signed it, and that he did not see either the deceased or Bullock place their signatures thereon.
It is conceded by all parties, and the trial judge so found, that the bequest to Fassbender is void under CL 1948, § 702.7 (Stat Ann 1943 Rev § 27.3178 [77]).
The other witness, Roy L. Bullock, testified before the circuit court that he ate supper with Fassbender and the deceased on the night of January 2d, and that the deceased had asked him to come and pack his suitcase because he was going to the hospital. He testified that during the evening the deceased called to him and asked him to come downstairs from his living quarters where deceased asked him to sign a paper. He testified further that a stranger came in before he could sign the paper and denied under cross-examination either that the deceased had identified the paper to him as his will or that he had signed it in deceased's presence. On the contrary, he asserted that he had actually signed the will upstairs some one to two hundred feet away from the kitchen where deceased had been.
He testified further that under instructions given by the deceased he took the paper home after signing it and put it in his strong box and kept it there until after the deceased's murder. On the night that deceased was murdered he testified that Mrs. Dalton, the proponent herein, telephoned him *618 around 10 o'clock in the evening and asked him to send the will on to her, which he did.
Proponent introduced testimony tending to indicate strained relations between the deceased and his sister, the contestant herein, between the time of the execution of the first and second wills. The proponent's testimony and cross-examination likewise sought to establish the existence of a friendly relationship between the contestant and the witness Roy L. Bullock.
Subsequent to Bullock's testimony proponent produced 2 witnesses to attack Bullock's credibility. One of them, Attorney John Walsh, Sr., testified that he had previously represented the proponent in the probate proceedings and that some time before the probate proceedings Roy L. Bullock came to see him. Concerning Bullock's statements to him at that time, Walsh testified:
"He said he was called to the Dalton apartment by Mr. Dalton and was told Mr. Dalton had written his will and wanted Roy to sign as a witness in the presence of Mr. Dalton."
An objection as to some of his testimony as hearsay was overruled by the trial judge.
Proponent then called Attorney George C. Quinnell who testified that he had seen and talked to Roy L. Bullock while he was representing contestant, Elizabeth Rezatto. After strong objection from counsel for the contestant the trial judge admitted the testimony pertaining to Bullock's conversation with him as follows:
"I asked him what the circumstances were when he signed the will and he told me that Mr. Dalton took the will to him when he was in the room upstairs and said to Mr. Bullock that he was making his will and that he wanted Bullock to sign the will *619 and that Bullock signed the will there in the presence of Dalton."
At the conclusion of the trial the trial judge in his opinion found as a fact that the deceased's second will was a holographic will and that the deceased had printed on the will the names of the witnesses and the dates of their signing. He further found as a fact that Bullock's direct testimony at the trial was intentionally false and that, as a matter of fact, Roy L. Bullock signed the second will in the presence of and at the request of the deceased. The trial judge thereupon reversed the order of the probate court and directed it to enter an order admitting the second will to probate.
The appellant in her brief raises 3 questions, each of some legal significance, which this Court will discuss and decide in reverse order.
"Was the alleged will of January 2, 1954, duly and properly executed in accordance with the statute, to-wit, CL 1948, § 702.5 (Stat Ann 1943 Rev § 27.3178 [75])?"
"Was the testimony of the witnesses Walsh and Quinnell as to inconsistent and contradictory statements made to them by the witness Bullock admissible as substantive proof of the facts related so as to meet the requirements of the statute relative to due and proper execution of a will?"
"Did the court err in admitting the testimony of witness Quinnell over the objection of contestant that the testimony was privileged?"
Rephrasing this last issue, the question may be stated as whether or not the attorney-client privilege extends to information received by the attorney in the course of his preparation of litigation from a third party, a prospective witness in that litigation.
*620 The trial court held that it did not. "I was of the opinion that it was not a privileged communication for the reason that witness Bullock was not in any sense an agent or employee of Mrs. Rezatto."
The precise question does not appear heretofore to have been dealt with in Michigan, but the rule of law involved appears to support the conclusions of the trial judge.
American Jurisprudence says on the point in question: "A mere witness in the cause is not the agent of the litigant in any sense; and therefore, his communications with the litigant's attorney are not privileged." 58 Am Jur, Witnesses, § 498, p 280.
Wigmore gives the reasoning behind this rule:
"The privilege is designed to secure subjective freedom of mind for the client in seeking legal advice. It has no concern with other persons' freedom of mind, nor with the attorney's own desire for secrecy in his conduct of a client's case. It is therefore not sufficient for the attorney, in invoking the privilege, to state that the information came somehow to him while acting for the client, nor that it came from some particular third person for the benefit of the client." 8 Wigmore, Evidence (3d ed), § 2317, p 615.
See, also, 70 CJ, Witnesses, § 556, p 414; Crosby v. Berger, 11 Paige Ch (NY) 377 (42 Am Dec 117); Gallagher v. Williamson, 23 Cal 331 (83 Am Dec 114); Lalance & Grosjean Manfg. Co. v. Haberman Manfg. Co., 87 F 563.
In a leading case concerning Federal court discovery rules, Hickman v. Taylor, 329 US 495 (67 S Ct 385; 91 L ed 451), Mr. Justice Murphy was dealing with efforts of a plaintiff under Federal discovery rules to ascertain the contents of statements from prospective witnesses taken by counsel for a defendant in a maritime accident. On page 508, Justice Murphy said as follows:
*621 "We also agree that the memoranda, statements and mental impressions in issue in this case fall outside the scope of the attorney-client privilege and hence are not protected from discovery on that basis. It is unnecessary here to delineate the content and scope of that privilege as recognized in the Federal courts. For present purposes, it suffices to note that the protective cloak of this privilege does not extend to information which an attorney secures from a witness while acting for his client in anticipation of litigation."
The general problem has been considered in Michigan in a series of cases including Alderman v. People, 4 Mich 414 (69 Am Dec 321); Hartford Fire Insurance Co. v. Reynolds, 36 Mich 502; Passmore v. Passmore's Estate, 50 Mich 626 (45 Am Rep 62); In re Bathwick's Estate, 241 Mich 156; Schaibly v. Vinton, 338 Mich 191, without consideration of the exact question herein raised.
In the Passmore Case Justice COOLEY, in stating the general rule, said as follows (p 627):
"There is a privilege of secrecy as to what passes between attorney and client, but it is the privilege of the client and he may waive it if he so chooses. * * * It is not the privilege of the court or of any third party."
Appellants have relied in this regard primarily upon City and County of San Francisco v. San Francisco Superior Court, 37 Cal2d 227 (231 P2d 26, 25 ALR2d 1418). There the medical witness whose testimony was excluded was held by the court to be an agent of the client in the transmission of information to his counsel and, hence, within the attorney-client privilege. In the instant matter the trial judge ruled, and the record supports him, that no such agency was involved. We conclude that the weight of authority in this country sustains the holding of the trial judge on this point and that his *622 holding is consistent with Michigan case law previously referred to.
The next question to be dealt with, rephrased for the purposes of this opinion, may be stated as whether or not hearsay evidence of a prior contradictory statement of a witness, admitted for purposes of impeaching his testimony on trial, may serve as substantive proof of the facts therein related.
It is apparent that the trial judge felt that this question could and should be answered in the affirmative. We believe that the weight of authority is to the contrary.
This rule is stated in 58 Am Jur, Witnesses, § 770, p 421, as follows:
"The rule is almost universally recognized that evidence of extrajudicial statements made by a witness who is not a party and whose declarations are not binding as admissions is admissible only to impeach or discredit the witness and not competent as substantive evidence of the facts to which such statements relate."
See, also, 133 ALR 1454.
Interestingly enough, 2 of the leading writers on evidence, and a number of the leading jurists, have attacked the rule stated above as arbitrary and artificial. McCormick, Evidence, p 73 et seq.; 3 Wigmore, Evidence (3d ed), § 1018.
Judge Learned Hand stated the argument for change in this regard in DiCarlo v. United States (CCA), 6 F2d 364, 368:
"The possibility that the jury may accept as the truth the earlier statements in preference to those made upon the stand is indeed real, but we find no difficulty in it. If, from all that the jury see of the witness, they conclude that what he says now is not the truth, but what he said before, they are nonetheless deciding from what they see and hear of that *623 person and in court. There is no mythical necessity that the case must be decided only in accordance with the truth of words uttered under oath in court."
McCormick, whose discussion of the problem would definitely favor change, concedes (p 79):
"But so far as I can find only 2 reported cases, one in Missouri and the other in Montana, have clearly espoused the principle contended for and the Missouri court has since retreated from its pioneer position."
Michigan cases seem consistently to support the orthodox view up to this time. In Hutchins v. Murphy, 146 Mich 621, the essence of the rule, in a situation closely paralleling the instant case, is stated in a headnote:
"Where a witness has testified that she did not execute a deed claimed to have been executed by her, testimony that she has stated elsewhere that she did execute such a deed amounts at the most to impeaching evidence, and is not proof that she did execute the deed."
See, also, Rosenberg v. Mageda, 251 Mich 696; People v. Row, 135 Mich 505; People v. Miner, 138 Mich 290.
The 2 criminal cases cited above probably serve to illustrate the reasons for the reluctance of the court to relax the rule under discussion and, hence, allow criminal convictions to stand where based on unsworn hearsay admitted for purposes of impeachment.
Accepting then for purposes of this opinion the orthodox and majority view on the stated question, it would of necessity be held that the hearsay testimony of attorneys Walsh and Quinnell as to witness Bullock's prior contradictory statements did not constitute affirmative proof that, in fact, witness Bullock signed the will in the presence of the testator. *624 The most that this testimony accomplishes, in accordance with the findings of fact of the trial judge, is to effect impeachment of witness Bullock's sworn testimony at trial. Since there is no other testimony in this record pertaining to how or where or when witness Bullock signed his name as witness to the will, with his testimony impeached as indicated above, the record may be considered as standing barren of any proof, affirmative or negative, in relation to whether or not Bullock's signature was placed on the will in the presence of the testator as required by statute.
This brings us then to the third of the questions raised by this appeal, which may now be rephrased as follows: Is a will, valid in all other respects, defeated by the lack of affirmative proof that one subscribing witness signed in the presence of the testator?
The pertinent portions of the statute in question, CL 1948, § 702.5 (Stat Ann 1949 Rev § 27.178 [75]), read as follows:
"No will made within this State * * * shall be effectual to pass any estate * * * unless it be in writing and signed by the testator * * * and attested and subscribed in the presence of the testator by 2 or more competent witnesses."
It is well established that where there is a complete attestation clause a presumption arises that the will was executed in accordance with the recitation therein. 76 ALR 617.
In the instant case the will in question, following the signature of the testator, had the single word "Witness 1-2-54" with the names of the subsequently subscribing witnesses printed in the handwriting of the testator.
ALR in this situation says as follows (p 622):
*625 "There is held to be a presumption of proper execution even though there is no attestation clause, where the attestation is merely by subscription, or followed by the word `witnesses'."
76 ALR 622, citing p 623, In re Rosenthal (1917), 100 Misc 84 (164 NYS 1060, 1061) says as follows:
"Where the signatures of the testator and witnesses were established, it was held that a presumption of proper execution existed, although there was no attestation clause. * * * `There is, I think, a presumption that a testamentary script coming from proper custody, if subscribed by the deceased testator and witnessed by 2 witnesses since deceased, was executed according to the statute of wills.'"
To the same effect, Leatherbee v. Leatherbee, 247 Mass 138 (141 NE 669); and Burkland v. Starry, 361 Mo 348 (234 SW2d 608, 40 ALR2d 1217).
The leading case in Michigan dealing with this general problem appears to be Abbott v. Abbott, 41 Mich 540. Chief Justice CAMPBELL said therein (pp 542, 543):
"But we know of no rule of law which makes the probate of a will dependent upon the recollection or even the veracity of a subscribing witness. The law, for wise and obvious reasons, requires such instruments to be executed and attested with such precautions as will usually guard against fraud. But if the forgetfulness or falsehood of a subscribing witness can invalidate a will, it would be easy in many cases to use such artifices or corruption as would render the best will nugatory. Their evidence is not conclusive either way, nor does the law presume that they are either more or less truthful than others. It presumes they had when they signed, full knowledge of what they were doing, and in case they are dead their attestation when proved is prima facie evidence that all was done as it should be. But in all contested will cases the case is open for general *626 witnesses, and when the testimony is all in, each witness is credited according to the impression he leaves of candor and intelligence, and not according to his being or not being an attesting witness."
See, also, In re Connery's Estate, 175 Mich 544; In re Dougherty's Estate, 168 Mich 281 (38 LRA NS 161, Ann Cas 1913B, 1300); and In re Shattuck's Estate, 324 Mich 568.
In the last named case Justice DETHMERS comments, page 574:
"A will duly executed by a testator may not be invalidated merely because those whom he asks to sign as attesting witnesses prove to be lacking in veracity."
We have reviewed with care the authorities cited in appellant's brief without finding conflict with the views stated above.
The record on appeal in this case presents testimony from which the trial judge could have made the findings of fact which have previously been recited, with the exception of that pertaining to witness Bullock's signature having been placed on the will in the presence of the testator.
In accordance with the discussion immediately above, we hold that witness Bullock's testimony pertaining to this issue, having been impeached, the record stands barren of any valid evidence as to where and how his signature was placed thereon. It is conceded by all parties on appeal that witness Bullock's signature was placed on the document by Bullock following the word "witness". Under these circumstances we hold that a presumption arises that it was placed there in accordance with the requirements of the statute and in the presence of the testator.
For the reasons outlined above the judgment of the circuit court reversing the order of the probate *627 court of the county of Marquette admitting to probate the will of John M. Dalton under date of September 30, 1949, and directing said probate court to enter an order admitting the will of John M. Dalton, under date of January 2, 1954, to probate as the last will and testament of John M. Dalton, is hereby affirmed. Costs to the appellee.
DETHMERS, C.J., and SHARPE, SMITH, BOYLES, KELLY, CARR, and BLACK, JJ., concurred.