### PEOPLE v SQUIRE

Docket No. 56859. Submitted July 15, 1982, at Detroit.—Decided March 8, 1983.

Russell Squire, a juvenile, was charged in the Wayne Probate Court with first-degree murder, assault with intent to murder and felony-firearm. The probate court waived jurisdiction and defendant was convicted in Recorder's Court of Detroit of second-degree murder and felony-firearm, Warfield Moore, Jr., J. Defendant appealed. *Held:*

1. The court erred in holding that the prosecutor could question defendant's former attorney concerning matters covered by the attorney-client privilege, if defendant's former attorney testified as to what certain witnesses had told him. A party does not waive the attorney-client privilege by presenting his attorney as a witness to testify regarding matters not communicated by that client.

2. The court erred in holding that a misstatement by defendant's counsel during his opening statement placed defendant's character as a law-abiding citizen in issue and that defendant could be impeached by evidence of his juvenile record. Juvenile court charges are not convictions in the criminal law and may not be used to impeach a defendant.

3. The court did not err in denying defendant's request for an instruction on self-defense.

Reversed and remanded.

1. ATTORNEY AND CLIENT — PRIVILEGE.

A party does not waive the attorney-client privilege by presenting his attorney as a witness to testify regarding matters not communicated by the client.

REFERENCES FOR POINTS IN HEADNOTES
[1] 81 Am Jur 2d, Witnesses § 228.
[2] 30 Am Jur 2d, Evidence § 1082.
    81 Am Jur 2d, Witnesses § 618.
[3] 32B Am Jur 2d, Federal Rules of Evidence § 426.
    81 Am Jur 2d, Witnesses § 575.
    Use of judgment in prior juvenile court proceeding to impeach credibility of witness. 63 ALR3d 1112.

2. EVIDENCE — PRIOR CONSISTENT STATEMENTS.
   A prior consistent statement of a witness may properly be admitted to rebut an implication that the witness's testimony was the result of recent fabrication.

3. EVIDENCE — JUVENILE COURT RECORDS — RULES OF EVIDENCE.
   Juvenile court charges are not convictions in the criminal law and may not be used to impeach a defendant (MRE 609[d]).

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Edward Reilly Wilson,* Deputy Chief, Civil and Appeals, and *Michael F. Bakaian,* Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *R. Steven Whalen),* for defendant on appeal.

Before: T. M. BURNS, P.J., and BEASLEY and C. W. SIMON,* JJ.

C. W. SIMON, J. A Recorder's Court jury found defendant guilty of second-degree murder, MCL 750.317; MSA 28.549, and felony-firearm violation, MCL 750.227b; MSA 28.424(2). Defendant was sentenced to serve from 8 to 30 years imprisonment on the murder charge and to a mandatory term of 2 years on the felony-firearm count. He appeals his conviction and sentence by right.

Because of several errors in the trial, we reverse and remand for a new trial.

Defendant was originally charged in the Wayne County Juvenile Court with first-degree murder, assault with intent to murder, and felony-firearm violation. The court waived its jurisdiction and defendant was ordered to stand trial as an adult.

The facts are not in serious dispute. On the evening of December 15, 1979, a disco dance was

---

* Circuit judge, sitting on the Court of Appeals by assignment.

held at the Park Avenue Club in downtown Detroit. The defendant and Patrick Perry were hired by the dance promotor, Robert Jordan, to assist in maintaining order and in collecting an admission charge. Between 2:00 and 2:30 a.m. on the morning of December 16, 1979, there was a fist fight at or near the entrance to the club. The participants, Charles Neely (Dirty Mike) and another man called Dirty Disco, were observed by a small crowd of 15-20 persons.

During the course of the fight, the homicide victim, Richard T. Wilson (Preacher) and his friend, Hudson Ray, Jr., approached the fight, apparently to observe the action. As Wilson approached, the defendant came toward him and said, "Do you remember * * *". Soon after, witnesses heard a series of five or six shots. Minutes after that, Wilson collapsed and died inside the Park Avenue Club.

Hudson Ray, Jr., said that the defendant pushed Wilson, then shot him twice. Ray also testified that three other men with the defendant attacked him before the shots were fired. At the sound of the shooting the crowd outside the Park Avenue Club panicked and ran. Ray said that he ran and that while he was running he heard three or four more shots.

Ray ran into an attended parking lot and sought refuge in the lot caretaker's booth. While there, he saw the defendant and three or four others run by. The defendant hid behind parked cars, then ran north on Park Avenue. Feeling that matters had settled, Ray returned to the Park Avenue Club and summoned police.

Teresa Squire, defendant's sister, and her friends, Reginald Stringer and Felecia Denson, testified that they were near the entrance to the

Park Avenue Club when the first shots were fired. All three witnesses testified that, as the defendant moved toward Wilson, Wilson reached into his pocket for something or made a sudden movement. All testified that both the defendant and Hudson Ray ran from the scene when the shots were fired; Ray toward Park Avenue, and the defendant east, toward Woodward Avenue.

Ms. Squire and Ms. Denson said that they saw Neely (Dirty Mike) with a gun and, after the shots were fired, they ran back into the Park Avenue Club. Witness Andrea Johnson testified that both defendant and Neely were armed. She also told the jury that Neely had threatened to shoot "someone" that night. Stephanie Taylor stated that Neely threatened to hit her with his gun. Defense counsel and the prosecution stipulated Neely (Dirty Mike) died on April 20, 1980, in an unrelated incident.

Examination of evidence collected at the scene and the autopsy conducted on the victim's body confirmed that a number of shots had been fired near the Park Avenue Club entrance. The deceased expired from two wounds to his chest. Police ballistics experts testified that the four .32 caliber slugs which were recovered from the victim and the doorway to the Park Avenue Club probably came from the same weapon.

The defense presented no witnesses at trial.

During the course of trial, the prosecutor established that Teresa Squire, Felecia Denson, and Reginald Stringer had not told police about seeing Neely (Dirty Mike) with a gun at the time of the shooting or that they had seen the defendant run before the shooting commenced. The prosecutor argued that the three res gestae witnesses "conveniently surfaced just before the trial". However,

Squire and Stringer had testified on cross-examination that they both told this version of the shooting to defendant's court-appointed attorney in the juvenile court proceedings, John Minock.

To rebut the inference made by the prosecutor that the defendant's sister and her friends had fabricated the story about Neely's being armed, defense counsel sought to have defendant's appointed attorney in the juvenile court proceedings testify concerning his conversation with Squire, Denson, and Stringer.

When attorney Minock first appeared in court, the trial judge instructed him that if he took the witness stand the testimony he gave could not and would not be limited to conversations with the witnesses but that Minock would be required to answer all prosecution questions on cross-examination. The court discussed at length concerning its view of the attorney-client privilege. When Mr. Minock again appeared with his attorney present, the court and Minock's attorney had a long discussion regarding the waiver of defendant's attorney-client privilege if Minock took the stand.[1]

---

[1] *"The Court:* This man (attorney Minock) has not been here in court. The only thing he would know is something by hearsay, maybe what Mr. Kriger would have told him, the purpose for his calling him.

"Mr. Burgess, I don't have any problems with that. The only thing I am saying, sir, and I will let you answer, I know you are a learned lawyer. Answer me this, Mr. Burgess, is your client limited to answering only those questions that Mr. Kriger wants to in all of the matters that he may have consulted in reference to Mr.—the defendant in this case, Mr. Squire? Is he limited? Is the prosecutor limited from going into those areas?

*"Mr. Burgess (attorney Minock's counsel):* Well—

*"The Court:* Let me give you a for instance. Suppose the prosecutor says to him, 'Did you have a conversation with Mr. Squire?' Let me give you a scenario. Okay, he is going to get up. Let's assume Mr. Minock is going to get up and he's gonna say, I talked to A, B, C, D, E Witnesses, and they said this and this and this, and I told them after they said that, this: It was advice. I was the lawyer representing Mr. Squire. All right, sit down. Cross-examine. Now Mr. Baker gets up. Mr. Minock, did you also have conversation with Mr. Squire about

Judge Moore ruled that, if attorney Minock testified, the prosecution could cross-examine him on matters within the attorney-client privilege. Minock did not testify. On appeal defendant urges that the actions and ruling of the trial court were erroneous and we agree.

this matter? And his answer has got to be yes. Did you talk about what happened? And his answer will be, yes.

"*Mr. Burgess:* About what matter?

"*The Court:* This whole matter.

"*Mr. Burgess:* Of the witnesses?

"*The Court:* No, about this matter of the shooting on Park at the Park Club on Elizabeth.

"*Mr. Burgess:* How is that relevant to this issue?

"*The Court:* The relevancy, Mr. Burgess, is can he be limited only to that one thing. Can I say to the prosecutor, you cannot go into whether or not he had a conversation with Mr. Squire. Now, you tell me.

"*Mr. Burgess:* Your Honor, as I see the issue again, let me—I guess it seems to me that this issue might be solved somewhat as if counsel would make an offer of proof, and your Honor would rule on it prior to the jury coming in.

\*   \*   .\*

"*Mr. Burgess:* Well, your Honor, I think—one last point and I won't belabor this—but I think that you put your finger on it. This is a unique situation. We have an attorney testifying. I think that your Honor has the power to control the testimony in the cross-examination.

"*The Court:* I will allow everything that is relevant, Mr. Burgess. I am telling you that's what I'm saying. I am going to allow, I am going to allow the prosecution as much scope to cross-examine this witness as I have allowed the defense to cross-examine any other witness.

"*Mr. Burgess:* I understand that. May I make a statement, and I will finish up here.

"I think your Honor, that that is, what in effect will do, it will prevent Mr. Minock from taking the stand and offering testimony, and I think that his testimony can be very narrowly limited. And that, your Honor, under these circumstances that you have got an attorney, and since you really by allowing the cross-examination to be so expansive, invading the attorney-client privilege without any purpose, without any necessity to do so, that your Honor really should narrow it to that issue alone.

\*   \*   \*

"*The Court:* It has nothing to do with what we are talking about. You are talking about for a motion. If he came in here for a motion, fine, you can have it. You can have that. But we are not here for a motion, we are here in trial. And if he testifies—listen, I will tell you my ruling. My ruling is, if he takes the stand and testifies, he's a witness for all purposes."

Michigan has long recognized that a party does not waive the attorney-client privilege by presenting his or her attorney as a witness to testify regarding matters not communicated by the client. *Steketee v Newkirk,* 173 Mich 222, 232; 138 NW 1034 (1912); *In re Dalton Estate,* 346 Mich 613, 620-621; 78 NW2d 266 (1956). Here, defense counsel sought the testimony of attorney Minock to rebut the prosecutor's argument that the testimony of the defendant's sister and her two friends was a recent fabrication, dreamed up for the trial. Given the fact that the three were eyewitnesses to the shooting and that their testimony directly contradicted the testimony of witness Hudson Ray, Jr., we find that the error cannot be harmless.

While prior consistent statements of a witness are not admissible as substantive evidence, such statements are admissible to support the witness's testimony in rebuttal of an allegation of a recent fabrication. *People v DeLeon,* 103 Mich App 225, 233; 303 NW2d 447 (1981). Thus, the testimony of attorney Minock, relevant and probative concerning what the defendant's sister and her friends told her they had seen at the scene of the shooting, was, we find, improperly excluded by the trial court's ruling that, if Mr. Minock testified, defendant would waive the attorney-client privilege.

Coercion of this type, for whatever reason, by the prosecutor or by the court is not permitted. *People v Pena,* 383 Mich 402, 406; 175 NW2d 767 (1970); *People v Collier,* 105 Mich App 46, 53; 306 NW2d 387 (1981); *People v Jackson,* 114 Mich App 649, 661-662; 319 NW2d 613 (1982). See, also, *Webb v Texas,* 409 US 95; 93 S Ct 351; 34 L Ed 2d 330 (1972).

During defense counsel's opening statements, he told the jury:

"You're also going to hear that my client is 17-years-old and has never been in trouble, never been convicted of a crime before.

*"Mr. Baker:* Objection, your Honor. Never been in trouble.

*"The Court:* Yes, sir. You should not have said that counsel. I'm going to allow for there to be inquiry into that. That is not a true statement and you should not have made it, counsel, to this jury.

*"Mr. Kriger:* You will hear, ladies and gentlemen, that my client has never been convicted of a crime. Never been found guilty of any crime in his entire life.

"Perhaps, I misspoke myself when I said he has never been in trouble. My apologies to that. I didn't mean to represent that he's never been in trouble but you'll see that he's never been found guilty of any crime at any time in his life."

Following this opening statement, out of the jury's presence, defense counsel called his error to the trial judge's attention:

*"Mr. Kriger:* One other thing for the record. In my opening statement I stated that my client had never been in trouble.

*"The Court:* Right.

*"Mr. Kriger:* Perhaps I misspoke myself and before I had an opportunity to correct it the court interjected that that wasn't a true statement, that in fact, he was going to let them go into that. I don't think that was proper.

*"The Court:* All right, counsel, your objection is the record."

The court later held that defendant's character as a law-abiding citizen had been placed in issue and defendant could be cross-examined as to his "trouble" if he took the stand. Later, defense counsel said defendant would not take the stand for reasons clearly on the record.

From our reivew of the record, we are convinced

that defendant's counsel's misstatement, corrected by him, in the jury's presence, did not place this defendant's character as a law-abiding citizen in issue. Counsel's immediate correction, along with an admonishment by the court, was sufficient to apprise the jurors that the defendant had indeed "been in trouble" previously, though he had not been convicted of a felony.

As a result of the court's ruling, defendant did not take the stand.

Juvenile court charges are not convictions in the criminal law and may not be used to impeach a defendant. MRE 609(d); MCL 712A.23; MSA 27.3178(598.23). *People v Luther,* 20 Mich App 42, 44-45; 173 NW2d 797 (1969); *People v Ball,* 33 Mich App 288, 290; 189 NW2d 816 (1971). The ruling by the trial judge that defense counsel's opening statements placed the defendant's character in issue and that, therefore, defendant's character could be attacked by his prior record in the juvenile courts was error.

Finally, we believe that it was not error for the trial judge to refuse to instruct the jury on self-defense. During the course of the trial, witnesses Teresa Squire, Reginald Stringer, and Felecia Denson all testified that the deceased moved suddenly as if reaching into his pocket or jacket immediately prior to the shooting. The trial judge ruled that he would not give a requested instruction on self-defense because there was insufficient evidence to support such an instruction. Defense counsel registered an objection.

While it is true that the existence of some evidence on the issue of self-defense would make mandatory an instruction, *People v Hoskins,* 403 Mich 95, 100; 267 NW2d 417 (1978), defense counsel sought to manufacture a self-defense theory

from the innocent act of placing a hand in a pocket. Did the deceased reach for cigarettes, money, or glasses, or any of the many things that citizens carry in the pockets of their clothing? The inference that the victim was reaching for a gun or other weapon is not supported by any evidence of agression on his part; no fighting words, no argument, and no offensive posture.

Moreover, the defense stance throughout the trial, if witnesses Squire, Stringer, and Denson can be believed, was that when the shooting began defendant ran the other way and he did not have a weapon at all. The testimony of these witnesses was that Charles Neely (Dirty Mike) was the man who did the shooting. Thus, we find no evidence or theory which would support an instruction that the defendant acted in self-defense. The trial court properly refused to give the instruction. *People v Morris,* 99 Mich App 98, 100-101; 297 NW2d 623 (1980).

Evidence of an earlier altercation between the defendant and the deceased was properly admitted at trial.

We have examined the other issues raised in defendant's appeal and conclude that they merit no further analysis.

Reversed and remanded for a new trial.