TERRY REGAN *et al.*, Plaintiffs-Appellants and Cross-Appellees, v. GARFIELD RIDGE TRUST AND SAVINGS BANK, as Trustee, *et al.*, Defendants-Appellees and Cross-Appellants.

Second District   No. 2—90—1238

Opinion filed October 25, 1991.

Reese J. Peck, of Rathje, Woodward, Dyer & Burt, of Wheaton, and James Kottaras, of Schlyer & Associates, P.C., of Griffith, Indiana (Donald E. Schlyer, of counsel), for appellants.

Christopher P. Koback and Joseph E. Potchen, both of Nisen & Elliott, of Chicago (Michael H. Moirano, of counsel), for appellees.

JUSTICE DUNN delivered the opinion of the court:

Plaintiffs, Terry Regan and Dennis Egan, filed a three-count complaint against defendants, Garfield Ridge Trust & Savings Bank, as trustee under trust number 85—5—2 (land trust), Carl Ivanelli, Sr. (Carl Sr.), Carl Ivanelli, Jr. (Carl Jr.), James Ivanelli (James), and Jerry Ivanelli (Jerry). In count I, they sought specific performance of a contract for the purchase of certain real estate from the land trust. In count II, they alleged that Carl Sr. tortiously interfered with the contract. In count III, they alleged that the other three defendants, who were land trust beneficiaries when the contract was executed, conspired with Carl Sr. to tortiously interfere with the contract. The trial court granted plaintiffs specific performance while the jury entered a verdict against only Carl Sr. on the other two counts, awarding plaintiffs $400,000 on count II and $200,000 on count III. The trial court entered judgment notwithstanding the verdict in favor of Carl Sr. on count III, and plaintiffs appeal. They contend that the entry of judgment notwithstanding the verdict was error and that they are entitled to a new trial on count III because the jury finding that only one defendant was involved in the alleged conspiracy was inconsistent.

Defendants also appeal and raise the following contentions: (1) that plaintiffs were not entitled to specific performance because they were in breach of certain material contract provisions; (2) that Carl Sr. cannot be held liable for tortiously interfering with the contract because he was acting as an agent for the land trust beneficiaries; (3) that Carl Sr. was privileged to interfere with the contract because of his agent's status; (4) that the trial court erred by allowing testimony concerning a prior conviction of Jerry; (5) that two attorneys who represented plaintiffs during the course of the transaction and who testified at trial should not have been allowed to decline to answer certain questions on the basis of the attorney-client privilege; (6) that the trial court erred by instructing the jury not to make any negative inferences from the above assertion of the privilege; and (7) that plaintiffs' counsel improperly failed to complete his impeachment of a defense witness. We affirm.

On March 6, 1986, plaintiffs and the land trust executed a contract for the purchase of a 34-acre parcel of land in Lemont to which the trust held title. The land trust beneficiaries, which included Carl Jr., James, Jerry, and their two sisters, directed the trust to enter into the contract, which provided for a purchase price of $400,000.

The contract further provided as follows. Within six months of its execution, plaintiffs were to pay $100,000 into an escrow account. If plaintiffs had complied with certain requirements set forth in paragraph two, they were to receive title to four lots on the parcel. These included construction of a portion of a roadway which would provide access to the eastern third of the parcel, construction of entrance way markers on the road leading to the parcel, removal of debris from the property, and submission of a plat of subdivision and its approval by local authorities. Each of the above was to be done within six months of the agreement's execution or by September 6, 1986.

By March 6, 1987, plaintiffs were to deposit another $150,000 into escrow. At the same time, they were to receive title to an additional four lots. The remainder of the purchase price was to be paid by September 6, 1987, at which time plaintiffs were to receive title to the remainder of the parcel. The trust beneficiaries had an option to retain up to three lots at a price of $22,000 per lot. Additionally, the agreement stated that at least five days prior to closing, the seller was to provide title commitment insurance in an amount equal to or greater than the purchase price.

The following evidence was brought out at trial. Plaintiffs formed a corporation called Bluff Point Development Company for the purpose of developing the subject property. Dennis Egan was to provide the

necessary funds to purchase the land, and Terry Regan was to supervise its development. The Ivanellis had been unable to develop the property because of problems with procuring sewer and water service.

According to Terry Regan's testimony, the Ivanellis provided him with proposed plats of subdivision during the negotiations for the purchase of the property. These proposed plats suggested that the area could be serviced by means of a well and a septic field. Percolation tests performed early in 1987, however, showed that the soil was not suitable for a septic field.

Additionally, after plaintiffs submitted a proposed plat to county authorities in April, they discovered that the road could not be built in the area suggested by the Ivanelli plats because the grade was too steep to meet county requirements. They therefore placed the road in a different location on subsequent revised plats submitted to the county. Even in that location, considerable excavation was required to come close to the county requirement of a maximum road grade of seven degrees. Plaintiffs obtained a variance from the county so the road could have a slightly higher grade. Regan testified that road construction could not begin until a permit was obtained in September 1986. Because they had to excavate up to 14 feet of dirt in some areas, the road took four months to build when it ordinarily might have taken 10 days. According to Regan, the road was substantially complete in January 1987.

Plaintiffs solved the sewer and water problem by persuading a nearby utility company, Citizens Utility, to provide such service. Citizens was a captive utility company which had provided service solely to Santa Fe Industrial, which owned land near the subject property. Citizens agreed in June 1987 to provide sewer and water service to the subject property, according to Regan, with Santa Fe providing a necessary easement to plaintiffs. Later that month, the Du Page County Plat Review Committee approved plaintiffs' fourth revised plat. Regan testified that the sewer and water problem was primarily responsible for delaying plat approval.

Under the contract, the initial closing was to take place on or before September 6, 1986. Defendants presented testimony that the delay occurred because plaintiffs had requested extra time to come up with the money. Plaintiffs testified, however, that the delay occurred because a $250,000 lien showed up on a title policy. That lien had been paid off by Carl Sr. five years earlier. The parties also agreed to modify the contract as follows. Plaintiffs made a $25,000 payment to the trust beneficiaries on September 9, 1986, to show good faith. At the time of closing, plaintiffs paid the beneficiaries $75,000 and received title to

three lots. Plaintiffs also paid $25,000 into an escrow account to be used to pay an excavating company which worked on the road. The beneficiaries placed one additional lot deed in escrow to ensure completion of the road.

Plaintiffs did not make the $150,000 payment that was due on or before March 6, 1987, nor did the beneficiaries send plaintiffs a title commitment for the lots to be conveyed at that time. Egan and Regan both testified that Carl Sr. told them not to worry about the $150,000 payment. Regan stated that this was because of the troubles plaintiffs had encountered with respect to the property, including the sewer and water problem. According to Regan, the beneficiaries did not demand payment of this sum. Egan testified that half the beneficiaries wanted payment, and half were not worried about it. William Ryne, one of plaintiffs' attorneys with respect to the transaction, testified that the beneficiaries' attorney, James O'Neal, did inquire about the $150,000 payment several times during telephone conversations in the spring and summer of 1987. Carl Sr., Carl Jr., and James denied telling plaintiffs not to worry about the payment. James testified that he went to the property and served a written default notice upon Regan in June 1987. Regan denied this, and no copy of the notice was admitted into evidence.

Beginning in July 1987, Carl Sr. proposed a series of new agreements with Regan and Egan. According to defense testimony, these plans were designed to have Carl Sr. arrange financing for plaintiffs so the transaction would close in September. Regan's testimony, however, indicated that the purpose of these plans was to enable the parties to purchase an adjoining 181-acre tract and other adjoining land for the purpose of developing the land as a golf course. In several of these proposals, Carl Sr. and a friend were each to receive a percentage of Bluff Point Development Company. Regan and Egan agreed to the first four proposals submitted by Carl Sr., but Carl Sr. returned to them each time and stated the beneficiaries would not agree. Finally, early in September 1987, Carl Sr. suggested a plan pursuant to which he and a friend would each receive 30% of Bluff Point in return for providing financing. Plaintiffs turned this deal down.

On August 11, 1987, James O'Neal, the beneficiaries' attorney, sent a letter to one of plaintiffs' lawyers, David McDermott, complaining about certain alleged defaults, including the $150,000 payment. McDermott sent a letter on August 19 to O'Neal stating that the defaults would be cured by prompt payment of all outstanding sums. The attorneys subsequently set a closing date of September 6, 1987, which was eventually changed to September 21 by agreement of the parties.

O'Neal sent a default notice to plaintiffs' attorneys on September 10, 1987. The specified defaults were the $150,000 payment, failure to have the subdivision plat approved, failure to construct entranceway markers for the subdivision near the road, and failure to clear debris from the land. The contract required a written default notice, a seven-day period to cure defaults, and a written notice of termination.

On September 18, 1987, four of the trust beneficiaries assigned their interest in the trust to Carl Sr. Carl Sr. had a power of attorney from the fifth beneficiary, Jerry, who was in prison in Florida. Carl Sr. went to O'Neal's office, fired him as the trust's attorney, and took the file concerning the transaction. He instructed the trust to terminate the contract and sent a notice of termination to plaintiffs' attorneys.

Regan testified that early in the morning on September 18 Carl Sr. called him and said that he was taking over the contract and that there would be no closing on the 21st. Egan testified that Regan called him on the morning of the 18th to tell him what Carl Sr. had said. Egan further stated that one of his companies had over two barge loads of soy oil in a dock near Lemont. Egan was planning to sell this soy oil to a Louisiana company called Pacific Molasses in order to procure the necessary funds to buy the property, approximately $235,000.

Harold Meier, a Pacific Molasses official, testified that the company would have bought the soy oil from Egan's company had it been offered on the 18th. The price would have been about $250,000. Pacific Molasses bought all of the soy oil produced by Egan's company and was always willing to buy the oil if it was available. Meier further testified that Pacific Molasses wire-transferred the funds for oil it purchased within one or two days of being notified by Egan that the oil was available. Pacific Molasses ended up buying the oil in question several weeks after September 18. Egan stated that he did not sell the oil on the 18th because Regan had advised him the closing would not occur on the 21st, and Egan hoped the market price for soy oil would go up.

The September 21 closing had been scheduled to take place at Intercounty Title Company's Orland Park office. Carl Sr. testified that he never told plaintiffs this closing was cancelled; instead, he moved it to the office of his new attorney, Thomas Fawell. Regan and one of his lawyers showed up at Intercounty Title on September 21 to make sure that closing would not go ahead. No one else showed up.

Carl Sr. denied cancelling the September 21 closing, and he testified that the closing was rescheduled for Fawell's office later that day. Plaintiffs did meet with Carl Sr. at Fawell's office late in the afternoon on the 21st with attorneys for both sides present. Plaintiffs testified, however, that nothing was mentioned about the meeting being a clos-

ing. Regan stated that Carl Sr. told them at the meeting that the deal was off and plaintiffs were not going to get the land. Both plaintiffs testified that Carl Sr. then offered a final deal in which he and a partner would receive 80% of Bluff Point Development Company, leaving 20% for plaintiffs. Plaintiffs rejected this proposal. The next day plaintiffs sent the land trust a default notice for failing to go through with the closing.

Thomas Fawell testified that the September 21 meeting was an attempted closing. According to Fawell, the associate who was conducting the closing asked him to come into the room because the buyers did not have the necessary funds. When Fawell went in, plaintiffs asked to delay the closing. According to Fawell, plaintiffs claimed they could come up with the necessary funds but refused to identify specifically the source, stating only that it was an individual. Fawell then advised Carl Sr. not to schedule a new closing because it did not seem plaintiffs would ever be able to come up with the money.

Between December 1986 and May 1987, plaintiffs took deposits on lots from eight prospective buyers. These had to be returned when the contract fell through. After September 21, 1987, Carl Sr. made further efforts to develop the subject property. He corresponded with Santa Fe Industrial officials using Bluff Point Development stationary and held himself out as the company's owner. He flew to Texas in an effort to negotiate with Santa Fe officials for the purchase of the 181-acre tract adjoining the subject property, but they refused to speak with him. Carl Sr. also attempted to obtain sewer and water tie-in approval from Santa Fe and Citizens Utility but was unsuccessful. The Du Page County Forest Preserve District subsequently filed an eminent domain action to condemn the subject land. On May 23, 1988, Carl Sr. assigned his interest in the land trust back to his children.

The trial court awarded plaintiffs specific performance of the March 6, 1986, contract, and the jury awarded plaintiffs $400,000 on count II and $200,000 on count III against Carl Sr. only. Both the trial judge and jury found that plaintiffs did not breach the contract. The trial judge also found that any breaches were waived by defendants. Both parties now appeal. We will first consider the arguments raised by defendants beginning with the contention that the trial court erred by granting specific performance.

A trial court's decision to award specific performance will not be disturbed unless it is against the manifest weight of the evidence. (*Calvary Temple Assembly of God v. Lossman* (1990), 200 Ill. App. 3d 102, 105.) Defendants contend that the trial court's grant of specific performance was against the manifest weight of the evidence because

plaintiffs were in default of their contractual obligations, and they failed to show they were ready, willing, and able to perform at the time of defendants' alleged breach.

The general rule is that a party is only entitled to specific performance of a contract if he or she has complied with all of its terms or was ready, willing and able to do so but was prevented from complying by the other party. (*Beesley Realty & Mortgage Co. v. Busalachi* (1963), 28 Ill. 2d 162, 165.) A court may, however, relieve a defaulting purchaser from a forfeiture and order specific performance if it would be unreasonable to permit a forfeiture to occur. (71 Am. Jur. 2d *Specific Performance* §62 (1973).) Therefore, if the opposite party or parties engage in conduct that amounts to a waiver of the default, specific performance may still be ordered. (See *Kingsley v. Roeder* (1954), 2 Ill. 2d 131, 138-39; *Schmalzer v. Jamnik* (1950), 407 Ill. 236, 244; *Tantillo v. Janus* (1980), 87 Ill. App. 3d 231, 237-38.) Additionally, a minor nonmaterial breach by the plaintiff will not preclude specific performance. *Advance Components, Inc. v. Goodstein* (Tex. Civ. App. 1980), 608 S.W.2d 737, 739; *Clayten v. Proutt* (1961), 227 Md. 198, 203, 175 A.2d 757, 760; *Landau v. St. Louis Public Service Co.* (1954), 364 Mo. 1134, 1140; 273 S.W.2d 255, 259; Restatement (Second) of Contracts §369 (1981).

■ Here, there was ample evidence from which the trial court could reasonably have concluded that defendants waived plaintiffs' timely compliance with the March 6, 1987, deadline for making the $150,000 payment, having the subdivision plat approved, building the entrance markers near the roadway, and clearing debris from the land. Plaintiffs presented testimony that they received no default notices for the above reasons until September 10, 1987. While James O'Neal mentioned the above defaults in his August 11, 1987, letter to Dave McDermott, he also stated that the beneficiaries were still willing to close the transaction if they were remedied. Additionally, plaintiffs testified that after the March 6, 1987, deadline, Carl Sr. told them not to worry about the $150,000 payment.

There was also evidence from which the trial court could have concluded that plaintiffs were in compliance with some of the above contractual requirements or were ready, willing, and able to comply with them. Regan testified that Du Page County authorities approved the plat of subdivision in June 1987. While defendants maintain that the evidence shows the plat was not recorded, the contract required approval of the plat by the necessary local authorities not the recording of it.

Egan also testified that he would have obtained the necessary funds to complete the transaction by selling soy oil to Pacific Molasses

on September 18 if the contract had not been repudiated that day. Defendants argue that this testimony is dubious because their notice of contractual termination could not have reached plaintiffs by September 18 when it was mailed that day and the envelope bore a September 20 postmark. Regan testified, however, that Carl Sr. called him on the morning of the 18th and told him the September 21 closing was off. Egan testified that Regan called him the same morning to convey Carl Sr.'s message. The trial court could have concluded that Egan had sufficient assets to complete the transaction and would have converted those assets to cash if defendants had not repudiated the agreement. Tender prior to filing a specific performance complaint is not necessary if defendants have repudiated the contract. (*Bonde v. Weber* (1955), 6 Ill. 2d 365, 381.) Additionally, it was not necessary for plaintiffs to convert the asset in question, the soy oil, to cash in order to establish their right to specific performance. See *Tantillo*, 87 Ill. App. 3d at 238-39.

The trial court could have concluded reasonably that plaintiffs did meet their contractual obligation of clearing debris from the land as there was conflicting evidence on this issue. Although defense testimony that plaintiffs failed to build entranceway markers for the subdivision along the road leading to it was unrebutted, we consider this a minor breach which would not preclude specific performance. The question of whether a breach of contract is material should be decided by examining the inherent justice of the matter. (*Hickox v. Bell* (1990), 195 Ill. App. 3d 976, 992.) Although the Ivanellis wished to ensure that certain improvements would be made because of their option to retain three lots in the subdivision, the above breach would not have significantly affected the value of the property therein.

If specific performance is awarded in spite of a minor breach, it should be conditioned upon either compliance with the breached provision or payment of monetary compensation. (*Clayten v. Proutt* (1961), 227 Md. 198, 203, 175 A.2d 757, 760.) Although the trial court failed to do this, we see no need to remand the cause or modify the trial court's judgment because the Ivanellis have conveyed their three lots to plaintiffs and the property is the subject of an eminent domain action. It would therefore make little sense to direct plaintiffs to construct the markers.

We therefore determine that specific performance was an appropriate remedy and affirm the circuit court's judgment as to count I. Our holding makes it necessary to rule upon plaintiffs' motion to bar defendants from challenging their right to specific performance because of a partial settlement agreement allegedly entered into after trial. Plaintiffs alleged in that motion that defendants agreed to refrain from

challenging the grant of specific performance in this partial settlement. Our holding renders the motion moot.

We next consider the contention that Carl Sr. cannot be held liable for tortious interference with contract. The elements of this tort are as follows: (1) the existence of a valid, enforceable contract between plaintiff and another; (2) defendant's awareness of this contractual relationship; (3) defendant's intentional and unjustified inducement of a contractual breach; (4) a subsequent breach by the other as a result of defendant's wrongful acts; and (5) damages (*HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.* (1989), 131 Ill. 2d 145, 154-55). A party cannot be held liable for inducing the breach of his or her own contract. *Blivas & Page, Inc. v. Klein* (1972), 5 Ill. App. 3d 280, 286; see also *Salaymeh v. Interqual, Inc.* (1987), 155 Ill. App. 3d 1040, 1044.

In *Blivas & Page,* plaintiff presented evidence that defendant Klein promised to hire plaintiff as the architectural firm for a building project if Klein was approved as the project sponsor. The jury rendered a verdict against defendant Kay for tortious interference with the contract. Kay argued that since he became Klein's partner on the project after the contract was entered into, he became a party to the contract and could not be held liable for inducing its breach. On appeal, the court concluded that this argument was without merit because Kay was not an original party to the contract. *Blivas & Page,* 5 Ill. App. 3d at 286.

■■ ■ Here, as in *Blivas & Page,* Carl Sr., the party held liable for inducing the contractual breach, was not a party to the original contract. Under that holding, even though Carl Sr. became a party to the contract later on, he can still be held liable for tortious interference with it. Defendants argue that this rule should be reconsidered because contractual assignments are common in commercial transactions, and an assignee should not be subjected to potential tort liability for breaching a contract. We agree that *Blivas & Page* should not be applied to subject one who receives a contractual assignment to tort liability under ordinary circumstances for a subsequent contractual breach. However, we believe tort liability is appropriate if the third party procures the assignment with the express purpose of causing the breach, as one of the purposes of recognizing a cause of action for interference with contractual relations is to protect one's contractual relationship from tampering by others. (*Belden Corp. v. InterNorth, Inc.* (1980), 90 Ill. App. 3d 547, 551.) Since Carl Sr. repudiated the contract almost immediately after taking the assignments from the beneficiaries, the jury could find from the evidence that he did so with the intent of causing a breach. Therefore, tort liability is appropriate under the facts of this case.

Carl Sr. also argues that he cannot be held liable for tortious interference because he was acting as the agent of the beneficiaries at all relevant times. It has been held that an employee cannot be held liable for tortious interference with a contract involving his or her employer as long as the employee is acting in the employer's interest. (*Salaymeh v. Interqual, Inc.* (1987), 155 Ill. App. 3d 1040, 1044.) Even if this principle applies with equal force to agency relationships, as Carl Sr. argues, there is substantial evidence that Carl Sr. was acting in his own interests. Regan and Egan both testified that at the September 21 meeting Carl Sr. offered a deal in which he and another individual would receive 80% of Bluff Point Development Company. During the summer of 1987, Carl Sr. offered several other deals which would have given him lesser percentages of the company in return for providing financing.

Carl Sr. also argues that, by virtue of his agency status, he was privileged to interfere with the contract. Courts will recognize a privilege in intentional interference with contract cases if defendant acted to protect an interest of equal or greater value than plaintiff's contractual rights. (*HPI*, 131 Ill. 2d at 157.) A defendant protected by a privilege is not justified, however, in engaging in conduct unrelated to or antagonistic to the interest giving rise to the privilege. (131 Ill. 2d at 158.) The aforementioned evidence that Carl Sr. was acting in his own interest demonstrates that his actions were not within the scope of any privilege for agents. We therefore reject this contention and affirm the jury verdict against Carl Sr. as to count II.

Next, defendants contend that the trial court erred by allowing Jerry's criminal conviction to be brought out while Carl Sr. was being cross-examined. This occurred while plaintiffs' attorney was inquiring about the circumstance under which Carl Sr. received a power of attorney from Jerry. The trial court reversed a prior ruling barring any mention of Jerry's conviction, and Carl Sr. testified that he received the power of attorney because of Jerry's imprisonment on drug-related charges. It was subsequently brought out, however, that the power of attorney bore a May 1986 date which was a month prior to Jerry's arrest on those charges.

Defendants cite *People v. Montgomery* (1971), 47 Ill. 2d 510, in which our supreme court set the standards for the use of a witness' prior convictions to impeach the credibility of that witness. The *Montgomery* criteria are applicable to civil cases. (*Young v. Chicago Transit Authority* (1990), 209 Ill. App. 3d 84, 94.) Under *Montgomery*, the conviction is only admissible if it was punishable by over a year in prison or involved dishonesty. (*Montgomery*, 47 Ill. 2d at 516.) Additionally, the

conviction must have occurred within the past 10 years. (47 Ill. 2d at 516.) Even under these circumstances, the conviction is only admissible for impeachment purposes if its probative value outweighs the prejudicial effect. 47 Ill. 2d at 516.

*Montgomery* is not applicable here because evidence of the conviction was not admitted to impeach Jerry, who did not testify. Nevertheless, the concerns expressed by the court about the potential prejudice from this type of evidence (47 Ill. 2d at 514) are applicable. The trial court, however, has broad discretion in controlling cross-examination, and reversal will only result if this discretion is clearly abused and the abuse materially affected the trial's outcome. (*Elliott v. Koch* (1990), 200 Ill. App. 3d 1, 18.) On direct examination of Carl Sr., defendants brought out the existence of the power of attorney; therefore, the trial court could have reasonably determined that plaintiffs were entitled to inquire about the circumstances surrounding its execution. (See *Vinke v. Artim Transportation System, Inc.* (1980), 87 Ill. App. 3d 400, 411 (trial court properly allowed cross-examination relevant to matter raised on direct examination).) Furthermore, defendants' claim of prejudice is dubious since the jury found in Jerry's favor on count III. We therefore reject this contention.

Defendants also argue that it was improper for the trial court to allow William Ryne, an attorney for plaintiffs who handled the instant transaction, to refuse to disclose on cross-examination if Egan had told him whether there were sufficient funds to close the transaction. According to defendants, this error was exacerbated when the trial court instructed the jury that this assertion of the privilege should not result in any adverse inference against plaintiffs.

The attorney-client privilege applies to communications made in confidence by a client seeking legal advice of any kind to a professional legal adviser acting in that capacity. (*Cesena v. Du Page County* (1990), 201 Ill. App. 3d 96, 103.) Such communications are permanently protected from disclosure unless the privilege is waived. *Cesena*, 201 Ill. App. 3d at 103.

Defendants argue that the privilege was waived because plaintiffs called attorneys McDermott and Ryne to testify about their dealings with defendants and their lawyers. Selective disclosure of confidential communications by the client will generally result in a waiver of the privilege. (*In re Sealed Case* (D.C. Cir. 1982), 676 F.2d 793, 818.) However, if a client calls a former attorney to testify and that attorney reveals no privileged communications during direct examination, there is no waiver of the privilege. (*People v. Squire* (1983), 123 Mich. App. 700, 704-05, 333 N.W.2d 333, 335; *Aysseh v. Lawn* (1982), 186 N.J. Su-

per. 218, 225, 452 A.2d 213, 217-18.) Ryne and McDermott were not questioned about any confidential communications on direct examination, nor did they reveal the contents of any such communications. Thus, there was no waiver of the privilege, and it was properly invoked by Ryne during cross-examination.

■ We also reject defendants' contention that the trial court erred by instructing the jury not to draw any inference against plaintiffs due to the invocation of the attorney-client privilege. Allowing such an inference to be drawn could inhibit communications between attorney and client especially with respect to contractual transactions where there is often a possibility that the attorney will be called upon to testify if there is a contractual breach and litigation ensues. We therefore conclude that the trial court's instruction was appropriate.

■ Defendants also contend that a new trial is warranted because of improper attempts to impeach Thomas Fawell. More specifically, defendants complain that, while cross-examining Fawell, plaintiffs' attorney twice made insinuations which were not followed up with proof after Fawell denied them. This issue was not specifically raised in defendants' post-trial motion, however, and it is therefore waived. 134 Ill. 2d R. 366(b)(2)(iii); *Brown v. Decatur Memorial Hospital* (1980), 83 Ill. 2d 344, 358.

We now turn to the arguments raised by plaintiffs. Plaintiffs basically contend that either the trial court's entry of judgment notwithstanding the verdict with respect to count III should be reversed or a new trial should be granted because the jury verdict that only Carl Sr. participated in the conspiracy was legally inconsistent.

A judgment notwithstanding the verdict should be granted only in those cases where the evidence so overwhelmingly favors the movant that no contrary verdict based upon that evidence could stand. (*Delnick v. Outboard Marine Corp.* (1990), 197 Ill. App. 3d 770, 784-85.) Count III alleged that defendants conspired to interfere with the March 6, 1986, contract. Although a party cannot be sued in tort for inducing the breach of his or her own contract, the party can be sued for conspiring with a third party who has induced the breach. *Blivas & Page*, 5 Ill. App. 3d at 286.

A conspiracy is an agreement by two or more people to perform an unlawful act or a lawful act by unlawful means. (*ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.* (1980), 90 Ill. App. 3d 817, 829.) If the plaintiff relies upon indirect or circumstantial evidence to establish an individual's participation in a conspiracy, the evidence must be clear and convincing. (*Bimba Manufacturing Co. v. Starz Cylinder Co.* (1969), 119 Ill. App. 2d 251, 267.) If the evidence is circum-

stantial and the facts relied upon are as consistent with innocent conduct as guilty conduct, the court must find that the conspiracy was not proved. *ABC*, 90 Ill. App. 3d at 830; *Bimba*, 119 Ill. App. 2d at 270.

Here, there was no direct evidence that defendants entered into an agreement to breach the contract; the evidence on count III was entirely circumstantial. Plaintiffs rely on two facts to support their conspiracy claim. The first is that some evidence existed that the other defendants agreed with Carl Sr. to fire James O'Neal. The second is that the beneficiaries gratuitously transferred their beneficial interest in the land trust to Carl Sr.

The above facts are as consistent with nonconspiratorial conduct as they are with conspiratorial conduct. The unrebutted evidence presented by defendants, including O'Neal's testimony, was that O'Neal was fired because he had not been aggressive enough in bringing about prompt compliance with certain contractual terms and a closing of the deal. Furthermore, the gratuitous transfer of the beneficial interest in the land trust can be seen as a matter of convenience, since Carl Sr. had conducted negotiations on the beneficiaries' behalf relating to the transaction after the contract was entered into. While there was evidence that Carl Sr. sought to profit from the refusal to go ahead with the deal by demanding 80% of Bluff Point Development Company for him and a partner, there is no evidence that the Ivanelli children would have profited had Carl Sr. been successful. Since plaintiffs failed to present clear and convincing evidence that there was a conspiracy between or among the defendants to breach the contract, the trial court's entry of judgment notwithstanding the verdict on count III was proper.

Accordingly, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

McLAREN and GEIGER, JJ., concur.